**J.A. OLSON COMPANY,**
Plaintiff-Appellant,

v.

**CITY OF WINONA, MISSISSIPPI,**
Defendant-Appellee.

No. 86–4408.

United States Court of Appeals,
Fifth Circuit.

June 3, 1987.

Frank T. Moore, Jr., Jackson, Miss., Ira S. Broadman, Phoenix, Ariz., for plaintiff-appellant.

Walker W. Jones, III, Jackson, Miss., for defendant-appellee.

Before WILLIAMS, JOLLY and DAVIS, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

In this case we address the question whether the principal place of business of a corporation that has its executive offices in Chicago and its sole manufacturing plant in Mississippi is an Illinois or Mississippi entity for purposes of diversity jurisdiction.

J.A. Olson Company (Olson), is an Illinois corporation with its sole manufacturing plant in Winona, Mississippi. It brought suit in federal court against the City of Winona (Winona), an incorporated municipality of Mississippi, basing jurisdiction on diversity of citizenship. After appropriate discovery, Winona moved to dismiss for lack of jurisdiction on the ground that diversity of citizenship was lacking because Olson's principal place of business was in Mississippi. The district court agreed; furthermore, the court refused to apply the alter ego doctrine to impute to Olson the principal place of business of its parent, Stamatakis Industries, Inc., on the ground that that doctrine is only available to defeat jurisdiction and not, as it would here, create jurisdiction. Accordingly, the district court granted Winona's motion and dismissed Olson's complaint. This appeal followed.

## I

Olson, a wholly owned subsidiary of Stamatakis, is engaged in the manufacture of wooden picture and mirror frames, molding in lengths, and cornices. Its only manufacturing plant and storage facility is located in Winona, Mississippi. The plant also houses the administrative offices that provide accounting, bookkeeping, payroll and data processing services and a photography studio used to prepare Olson's sales catalogues. Olson also has a retail showroom in Winona that accounts for approximately three percent of the company's sales. Proceeds from these sales are remitted directly to Olson at Winona. At the time of the hearing the plant employed 113 people,[1] with an annual payroll in 1984 of over $1.7 million.

Bea Sullivan, as the general manager of the plant, generally oversees the functions of the facility. She is authorized to hire and fire employees, supervise employee training, and process employee grievances and workers' compensation claims. She also has input into decisions regarding the scheduling of production.

Olson maintains three bank accounts in Winona, two payroll accounts and one general account. Checks on these accounts, which are funded as needed by Olson's Chicago office based on information provided by Winona personnel, are processed in the Winona data processing office. Mr. Stamatakis is the authorized signatory on all the Winona accounts but his name is signed mechanically in Winona. Accounts receivable and payable are also handled by personnel at Winona.

In 1985, the plant purchased approximately $200,000 in supplies locally and over $500,000 in supplies in Mississippi. Olson belongs to the Mississippi Economic Council, the Mississippi Manufacturers Association, and the Mississippi Glass Association; Olson is not a member of any such organization in any other state. In sum, Olson has its base of operations in the State of Mississippi.

Much of its operation, however, is directed from outside the State of Mississippi. Olson's corporate office, as well as that of Stamatakis, is located in Chicago, Illinois. The Chicago office maintains Olson's corporate records, prepares and files Olson's corporate tax returns, compiles Olson's financial reports, and negotiates insurance coverage for Olson. Ninety-seven percent of the proceeds of Olson's sales are remitted to the Chicago office and deposited in a bank there. After consultation with the manager of Olson's Winona plant, Olson's corporate treasurer, Donald Kes, transfers the necessary funds from Chicago to Olson's bank accounts in Winona. According to Roger Miller, an executive vice president of Olson, most if not all of the major corporate and financial decisions are made in the Chicago office.

Miller, whose office is located in Dallas, Texas, visits Winona about once a month, but his address as shown on his business card and stationery is that of Olson's Winona plant. He coordinates Olson's marketing efforts, including the hiring of independent sales representatives, the extension of credit to customers, and determination of pricing. He consults with Bea Sullivan, the

**1.** This number fluctuates with need. In June 1985, all employees were laid off for one month.

Winona plant manager, regarding hiring decisions at the plant, and he is also responsible for decisions regarding the equipment and the number of employees needed at the plant.

Olson's other business functions are conducted in scattered locations. Olson's thirty-five to thirty-seven salespeople, termed by Sullivan as independent contractors, live in their different sales areas throughout the country. The majority of sales, however, are made through leased showrooms in Dallas and Atlanta where Olson employs only part-time secretaries. Donald Lull, Olson's controller, lives and works in St. Paul and Olson's independent auditor lives in Phoenix.

## II

■ Under 28 U.S.C. § 1332(a),[2] a corporation is deemed to be a citizen of both the state of its incorporation and the state of its principal place of business. Here, Winona, a Mississippi municipality, clearly is a citizen of Mississippi. Olson, by reason of the state of its incorporation, is a citizen of Illinois. Under section 1332(c), Olson is also a citizen of the state of its principal place of business. The situs of Olson's principal place of business for purposes of section 1332(c) is determinative of whether a federal court can exercise diversity jurisdiction over this case; if Olson's principal place of business is Illinois, the requisite diversity is present, but if Olson's principal place of business is Mississippi, the case must be dismissed for lack of jurisdiction.

## III

■ Our court has stated that we apply the "total activity" test to determine principal place of business. *Anniston Soil Pipe Co. v. Central Foundry Co.*, 329 F.2d 313, 313 (5th Cir.1964), *aff'g*, 216 F.Supp. 473 (N.D.Ala.1963). We have, however, failed to give form to that term except to say that it incorporates two tests that we have also neglected to explicate: the "nerve center" test and the "place of activity" test. *Vil-*

*lage Fair Shopping Center v. Sam Broadhead Trust*, 588 F.2d 431, 433–34 (5th Cir. 1979). In this case we attempt to give meaning to the "total activity" test as a means of determining a corporation's principal place of business.

Because the purpose of the "total activity" test is to determine principal place of business as that term is used in section 1332(c), the test must necessarily be expounded in a manner to effectuate the statutory purpose. Accordingly, we look first to the statute and its legislative history.

Next we look to the tests that we have stated comprise the "total activity" test. We will see that under the "nerve center" test, the state in which the corporation has its nerve center, or "brain," is its principal place of business, and under the "place of activity" test, the state in which the corporation carries out its operations is its principal place of business. Although this simplistic explanation of the two tests may make them appear to be conflicting principles, we will see that the two tests actually are in harmony because they are applied in different factual situations. The two "tests" have evolved because corporations are organized in different ways, and our analysis must be flexible enough to determine the place at which a given corporation actually does its principal business. In the end, we will see that "total activity," "nerve center," and "place of activity" are hardly more than terms we use in resolving the ultimate question: what is the principal place of business of the corporation.

## IV

■ Diversity jurisdiction exists for the purpose of providing a federal forum for out-of-state litigants where they are free from prejudice in favor of a local litigant. *See Jerguson v. Blue Dot Investments, Inc.*, 659 F.2d 31, 33 (5th Cir.1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2013, 72 L.Ed.2d 469 (1982); S.Rep. No. 1830, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.

---

2. 28 U.S.C. § 1332(a)(1) provides: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—(1) citizens of different States...."

Code Cong. & Admin.News 3099, 3102 (hereinafter "S.Rep."). Before 1958, a corporation was deemed a citizen only of its state of incorporation. *Id.* at 32. In 1958, Congress adopted an amendment to section 1332(c) to make a corporation a citizen not only of the state in which it was incorporated but also of the state of its principal place of business. *See* 28 U.S.C. § 1332(c) (hereafter the 1958 amendment). The amendment was intended to reduce the case load of the federal courts [3] and to remedy abuses of diversity jurisdiction. *Freeman v. Northwest Acceptance Corp.,* 754 F.2d 553, 558 (5th Cir.1985); *Jerguson,* 659 F.2d at 32. According to the Senate Report, the former statute had

> given rise to the evil whereby a local institution, engaged in a local business and in many cases locally owned, is enabled to bring its litigation into the Federal courts simply because it has obtained a corporate charter from another State....
>
> ....
>
> ... [The amendment] will eliminate [from federal diversity jurisdiction] those corporations doing a local business with a foreign charter but will not eliminate those corporations which do business over a large number of States, such as railroads, insurance companies, and other corporations whose businesses are not localized in one particular State. Even such a corporation, however, would be regarded as a citizen of that one of the States in which was located its principal place of business.

S.Rep. at 3101-02.

As originally proposed, the amendment made a corporation a citizen of "a state from business wherein it derived more than half its gross income during the fiscal year last preceding the commencement of the action." S.Rep. at 3126. The proposal was altered in 1951 to provide for the "principal place of business" test. *Id.* at 3132. The Senate Report stated that the new standard was to be applied in accordance with the same term in the Bankruptcy Act at 11 U.S.C. § 11,[4] thereby providing "sufficient criteria to guide courts in future litigation." S.Rep. at 3102.

■ The legislative history is an important guide in the methodology of determining a corporation's principal place of business. First, it directs us to similar language in the Bankruptcy Act of 1898. Apparently, however, courts have encountered the same conflicts in interpreting that statute. Collier notes: "There is some conflict in the cases as to whether the principal place of business is located at the general executive offices where the business affairs of the corporation are managed or in the district of the factories, mills, or mines of the corporation." 1 *Collier on Bankruptcy* § 2.19, 202-03 (14th Ed.1962). Our own cases demonstrate seemingly inconsistent standards in determining the principal place of business under the Bankruptcy Act. *E.g., compare Shearin v. Cortez Oil Co.,* 92 F.2d 855, 857 (5th Cir.1937) (under facts presented, principal place of business is location where corporation maintains business records and its only office, rather than district in which corporation's oil wells are located) *with Dryden v. Ranger Refining & Pipe Line Co.,* 280 F. 257 (5th Cir.), *cert. denied,* 260 U.S. 726, 43 S.Ct. 89, 67 L.Ed. 483 (1922), (under facts presented, principal place of business was where corporation carried on business rather than where it had its general office). Thus from these representative cases [5] interpreting

---

**3.** *See* S.Rep. No. 1830, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code & Cong.Admin.News 3099, 3103 (hereinafter "S.Rep.") (statistics indicate the amendment will eliminate 3.6 to 23.5% of diversity cases).

**4.** Section 11 provided in relevant part:

> The courts of the United States hereinbefore defined as courts of bankruptcy are ... hereby invested ... with such jurisdiction at law or in equity as will enable them to ...

> (1) Adjudge persons bankrupt who have had their principal place of business, resided, or had their domicile within their respective territorial jurisdictions for the preceding six months, or for a longer portion of the preceding six months than in any other jurisdiction....

**5.** Other cases include *Continental Coal Corp. v. Roszelle Bros.,* 242 F. 243, 247 (6th Cir.1917) (principal place of business of corporation with nerve center in Tennessee and extensive mining

the "principal place of business" language of the Bankruptcy Act, we draw this lesson applicable to the question before us today: the principal place of business is a fact question that follows no single inflexible test dependent solely upon the situs of the nerve center or upon the situs of activities of the corporation. These cases yield the lesson that we should not obfuscate the ultimate quest before us; the issue is not the nerve center of a corporation or the place of activity of a corporation but, rather, the issue is the principal place of business of the corporation.

Second, the Senate Judicial Committee's report states that the amendment is intended to further the original purpose of diversity jurisdiction, that is, to provide to out-of-state litigants a forum free of local bias. Such bias would seem to be most prevalent when a local party sues a foreign corporation that has little if any presence in the district. Any local prejudice is minimized when a corporation, even though incorporated in another state, has significant contact with the district through, for example, a factory that employs local people. In such a situation, the foreign corporation has some identity and familiarity with the people and the courts in the locality. Since the need for diversity jurisdiction is lessened when a foreign corporation has substantial visibility in the community, then our analysis should include consideration of the corporation's contact with the community.

■ Third, the amendment makes clear that every corporation has one and only one principal place of business. *See* S.Rep. at 3102 (corporation to be regarded as "citizen of that *one* State in which was located its principal place of business" (emphasis added)). That we are to search for a single place suggests that the corporate office of a business is especially significant when the corporation conducts its operations in several places.

operations in Kentucky was Kentucky); *Burdick v. Dillon,* 144 F. 737, 738 (1st Cir.1906) (principal place of business of corporation with nerve

## V

In interpreting the statute and the legislative history, we note that the cases indicate there has been no clearly consistent method applied to determine the principal place of business of a corporation. Although many factors have been considered and emphasized, two major focal points have evolved: the nerve center of the corporation and the place of activity of the corporation. These focal points have often been referred to as separate tests as though the application of one precluded the application of the second, but as we shall see, the ultimate question is not which test to apply, but rather which consideration, on the basis of the totality of the facts, predominates. Stated differently, we have observed that the "total activity" test applied in this circuit combines considerations of both the nerve center and the place of activity of the corporation in question. We turn now, however, to examine key cases that have emphasized one consideration over the other.

### A.

The "nerve center" test was coined in *Scot Typewriter Co. v. Underwood Corp.*, 170 F.Supp. 862 (S.D.N.Y.1959). In that case, Scot Typewriter Company (Scot), a New York corporation, brought suit in state court against Underwood Corporation (Underwood). Underwood removed the case to the district court and Scot moved to remand, asserting that Underwood was a New York citizen for diversity purposes because that was the location of its principal place of business. Underwood, however, argued that its principal place of business was in Connecticut.

Underwood manufactured typewriters and business machines in Connecticut, office and related supplies in New Jersey, and missile and radar components in California. All of these products were distributed and serviced in branch offices across the United States. Underwood's executive offices were located in New York. *Id.* at

center in Massachusetts and slate quarries and mills in Vermont and New York was Massachusetts).

864. Underwood conceded that its "New York City offices function[ed] on the executive level in the determination of policy and the co-ordination of all of its various policies." *Id.* According to Underwood, however, this did not make New York its principal place of business; because its major corporate function, the development and manufacture of typewriters and business machines, was located in Connecticut, Connecticut was its principal place of business. In Connecticut, Underwood had its largest number of employees, largest payroll and most tangible property. Additionally, most of its shipments were made from there as well as the majority of its purchases. *Id.*

The court rejected Underwood's argument that the situs of its typewriter and business machine manufacturing operations was controlling both conceptually and factually. The court observed that manufacturing is but one component of a corporation's business, and that other elements are equally significant. Additionally, the court relied on data showing that the volume of typewriters and business machine sales ranked third behind sales of products it manufactured in California and New Jersey, to conclude that the Connecticut operations did not constitute Underwood's major corporate function. *Id.* at 865. In holding New York to be Underwood's principal place of business, the court reasoned:

> Where a corporation is engaged in far-flung and varied activities which are carried on in different states, its principal place of business is the nerve center from which it radiates out to its constitu-

ent parts and from which its officers direct, control and coordinate all activities without regard to locale, in the furtherance of the corporate objective. The test applied by our Court of Appeals, is that place where the corporation has an "office from which its business was directed and controlled"—the place where "all of its business was under the supreme direction and control of its officers".

*Scot Typewriter,* 170 F.Supp. at 865 (footnote omitted).

Since *Scot,* the "nerve center" test appears to have been limited to similar facts, that is to "corporation[s] ... engaged in far-flung and varied activities which are carried on in different states." [6] *Scot,* 170 F.Supp. at 865. *See, e.g., Lugo-Vina v. Pueblo International, Inc.,* 574 F.2d 41, 43 n. 2 (1st Cir.1978) ("nerve center" test most appropriate for holding company); *Spector v. Rex Sierra Gold Corp.,* 227 F.Supp. 550, 551 (S.D.N.Y.1964) ("nerve center" test inapposite to company engaged in one activity in one state). In such situations, the nerve center, or corporate offices, will clearly be the principal place of business at which a corporation does business; the corporation's activities are dispersed to the point that no place in which the corporation conducts operations or activities can be denoted "principal."

That *Scot's* "nerve center" test does not, however, require strict designation of corporate offices as the principal place of business is reflected by the Seventh Circuit's application of the test.[7] In applying the

---

**6.** Some courts have held, however, that a corporation need not be very "far flung" to warrant application of the "nerve center" test. For example, in *Danbury Bowlarama Corp. v. RCA Corp.,* 414 F.Supp. 354 (S.D.N.Y.1976), the corporation's operations were comprised primarily of management tasks relating to operation of a single bowling alley in another state that required little labor or corporate attention to daily activities, circumstances that accentuate the significance of the corporate office. *Id.* at 357.

**7.** The Seventh Circuit has adopted the "nerve center" test to determine a corporation's principal place of business. *In re Air Crash Disaster Near Chicago,* 644 F.2d 594, 620 (7th Cir.1981). *In Re Air Crash* relies for this proposition on the case of *Sabo v. Standard Oil Co. of Indiana,* 295

F.2d 893 (7th Cir.1961). Although *Sabo* is cited for adoption of the "nerve center" test, it seems doubtful that *Sabo* stands for the inflexible rule that the principal place of business of a corporation must be determined to be the situs of its nerve center. There, the defendant corporation conducted operations relating to production, refining and marketing of crude oil products in fifteen states; its executive officers were located in Chicago. *Id.* at 893. In determining principal place of business, the court relied on *Burdick v. Dillon,* 144 F. 737 (1st Cir.1906) and *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862 (S.D.N.Y.1959), both of which deal with far-flung corporations and hold the corporation's principal place of business to be its nerve center. *Sabo's* holding, however, was "that the center of corporate activity and the corporate

test, the Seventh Circuit "look[s] for the corporation's brain, and *ordinarily* finds it where the corporation has its headquarters." *Wisconsin Knife Works v. National Metal Crafters*, 781 F.2d 1280, 1282 (7th Cir.1986) (emphasis added). Therefore the test apparently gives rise only to an inference that a corporation's principal place of business is its headquarters, *see id.;* other factors, including the corporation's activities, are fully considered.

This observation is well illustrated by *Kanzelberger v. Kanzelberger,* 782 F.2d 774 (7th Cir.1986), Warren and Geraldine Kanzelberger, Wisconsin residents, were sued by Warren's brother, James, an Illinois resident, and by Contemporary, Inc., an Illinois corporation. The requisite diversity of citizenship was present if Contemporary were a citizen of Illinois only. The court noted that the corporation was run "in rather a dictatorial fashion," *id.* at 777, by James in Illinois. On the other hand, Contemporary had its single plant and all employees and officers (except James) in Wisconsin. On the facts, the Seventh Circuit concluded that Contemporary's nerve center and therefore principal place of business was in Wisconsin.

If the Seventh Circuit's search for the principal place of business had ended when it found the corporation's "brain," it arguably would have concluded that Contemporary's principal place of business was Illinois. The court, however, examined *all of the activities* of the corporation to determine where its principal place of business was located. The court noted that Contemporary's single plant and substantially all its employees and officers were in Wisconsin. It compared these activities with those in Chicago where the office had a single, though "dictatorial" officer, James. The court, while recognizing the Seventh Circuit's rule that a corporation's principal place of business is its nerve center, concluded that Wisconsin was Contemporary's principal place of business. Notwithstanding the fact that the Seventh Circuit tips its hat to the "nerve center" test, *Kanzelber-*

*ger* illustrates that, when applied by that court, "nerve center" is only another term for "principal place of business," which is determined after examining all of the facts in a given case.

### B.

The "place of activity" test was first enunciated in *Kelly v. United States Steel Corp.,* 284 F.2d 850 (3d Cir.1960). In that case the plaintiffs, Pennsylvania citizens, brought suit against and obtained judgment against U.S. Steel. On appeal, U.S. Steel asserted that the district court did not have jurisdiction because its principal place of business was in Pennsylvania. In what appears to be the Third Circuit's first interpretation of the 1958 amendment, the court considered various tests that could be used to determine principal place of business. The court rejected identifying the state in which shareholders and the Board of Directors hold their meetings as the principal place of business for the reason that state law and corporate charters generally allow these meetings to be held in places totally unrelated to the business of the corporation. *Id.* at 852. The court also declined to adopt the "nerve center" test in this case because the organization of U.S. Steel provided for "a good many collections of nerve cells serving the common function of making the corporate enterprise go." *Id.* at 853.

The court then turned to the method of operation of U.S. Steel. It noted that activities which took place in New York included the filing of tax returns, meetings of the board of directors (although the board could and sometimes did meet elsewhere), the executive committee, the finance committee, the corporation's major banking and the management of its government securities and pension plan. Additionally, the chairman of the board, the president, the secretary, the treasurer and general counsel of U.S. Steel were in New York. *Id.* at 853–54. The court concluded that "[i]f the test of 'principal place of business' is where ... final decisions are made on

---

nerve center of the defendant was and is the State of Illinois." *Id.* at 895. Thus it would

seem that *Sabo* simply announced a factual determination in the case before it.

corporate policy, then New York was U.S. Steel's principal place of business." *Id.* at 854.

The board of directors, however, had delegated to its operation policy committee the authority to conduct the corporation's business. That committee was in Pennsylvania, and its duties included appointment of division presidents and corporation officers. Additionally, all of the executive vice presidents and most of the other vice presidents and their staffs were in Pennsylvania. The court also noted that Pennsylvania had far more U.S. Steel employees and tangible property than had New York or any other state.

Balancing the facts relating to the business operations in Pennsylvania and New York, the Third Circuit held: "All this points us to the conclusion that business by way of activities is centered in Pennsylvania and we think it is the activities rather than the occasional meeting of policy-making Directors which indicate the principal place of business." *Id.*

*Lurie Co. v. Loew's San Francisco Hotel Corp.,* 315 F.Supp. 405 (N.D.Cal.1970), is a classic case, cited often by the commentaries,[8] that graphically illustrates the dominance of the place of activities over the nerve center as a means of determining principal place of business. In *Lurie,* the defendant corporation was incorporated in Delaware and had its principal office in New York. The corporation had been organized to operate a hotel in California and that was its only activity. Rejecting the use of the "nerve center" test as being applicable only to wide-spread operations in several states, the court noted that "[w]here ... the corporation has its physical operations concentrated in one state and its administrative or executive offices in another state, the place of operations is

more frequently considered as decisive." *Id.* at 412 (quoting 1 Moore's Federal Practice, 717.77 ¶ 0.77[3.–4] ). The court considered the operations in California, which included the corporation's only assets, the vast majority of its employees and responsibility for day-to-day management, and held them to "outweigh the activities and formulation of overall policy in New York." *Id.* at 416. Although in *Lurie,* the court chose the corporation's place of activity as its principal place of business, it did not blindly adhere to any formalistic test. Instead, the court balanced the significance of the corporation's activity and policy-making functions and determined that, under these facts, the corporation's principal place of business was its place of activity.

### C.

■ Thus, neither the "nerve center" nor the "place of activity" test inflexibly dictates the corporation's principal place of business. Rather the tests simply stand for general rules regarding the determination of a particular corporation's principal place of business: the principal place of business of a far-flung corporation will generally be its nerve center, *see Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862 (S.D.N.Y.1959); the principal place of business of a corporation with significant administrative authority and activity in one state and lesser executive offices but principal operations in another state is generally the district of the former, *see Kelly v. U.S. Steel Corp.,* 284 F.2d 850 (3d Cir.1960); and the principal place of business of a corporation with its corporate headquarters in one state and its single activity in another will generally be in the state of its operations, *see Lurie Co. v. Loew's San Francisco Hotel Corp.,* 315 F.Supp. 405 (N.D.Cal.1970).[9] These rules,

---

**8.** *See, e.g.,* 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3625 (1984 & Supp.1986).

**9.** As our opinion indicates, *Scott, Kelly* and *Lurie* are the cases that best illustrate these points and are the cases that are invariably cited for these propositions. Although there are many other cases in which these principles have been applied, an extended case-by-case analysis

would shed scarcely more light on our discussion of the issue. The reader, however, may wish to refer to 13B C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3625 (1984 & Supp.1986), for a more detailed case-by-case reference.

however, are applied on a case-by-case analysis, weighing the particular facts. The two tests are therefore not mutually exclusive but rather complementary.

## VI

We now turn to review the cases in which we have applied the "total activity" test after the 1958 amendment requiring a determination of principal place of business. In *Anniston Soil Pipe Co. v. Central Foundry Co.*, 216 F.Supp. 473 (N.D. Ala.1963), *aff'd* 329 F.2d 313 (5th Cir.1964), the case credited with adopting the "total activity" test, the corporation had its office in New York and its only place of operations, the manufacture of soil pipe and fittings, in Alabama. 216 F.Supp. at 473. Ultimate corporate policy was made in New York, but the corporation's activities in Alabama provided the information for and received the benefit of those decisions. Additionally, many substantial business decisions were made in Alabama. *Id.* at 473–74. In reaching its conclusion, the district court stated:

> The court, after a thorough review of the total activity of the defendant, prefers to conclude flatly that its principal place of business is Holt, Alabama, whereas the control exercised by the New York office was intracorporate in nature.

We affirmed with no additional discussion. Although the district court opinion lacks analysis, it is clear that our holding was based on the facts that Alabama was not only the corporation's sole place of activity, but also the situs of part of the nerve center. Therefore, the corporation's principal place of business was Alabama. *Id.* at 475–76.

In *Village Fair Shopping Center v. Sam Broadhead Trust*, 588 F.2d 431 (5th Cir.1979), a case arising in Mississippi and the one in which we first clearly identified our analysis as applying the "total activity" test,[10] the corporation [11] was incorporated in Delaware and had its only office in New York. The corporation's only business consisted of real estate investments in California and Mississippi and commercial paper investments in New York. *Id.* at 433. We held that the "activity in New York [was] far more significant," constituting the greatest aggregate volume of the corporation's assets and requiring more frequent activity than the real estate investments; the investments in Mississippi and California, where it had another shopping center, were passive and occupied little of the corporation's time. *Id.* at 434. New York, the location of the corporation's offices, was therefore not only its nerve center but also the location of its primary activity, that is, the *management* of its assets. Accordingly, we held that New York was the corporation's principal place of business. *Id.*

In *Toms v. Country Quality Meats, Inc.*, 610 F.2d 313 (5th Cir.1980), Country Quality, a Delaware corporation qualified to do business in Georgia, was one of sixty similar corporations created and managed by Brueggemeyer & Wolfe (B & W), a Texas corporation. Country Quality, like the other local corporations, was run by B & W, but paid local taxes, had a local bank account, and had its own staff. B & W, however, exercised almost total control over Country Quality in that it was authorized to discharge employees, it reviewed all sales reports, time cards and payroll sheets and it selected the suppliers from

**10.** In *Danos v. Waterford Oil Co.*, 351 F.2d 940 (5th Cir.1965), we noted that in *Anniston* we had adopted the "total activity" test. *Id.* at 942. We do not discuss *Danos* here because in that case, the question was whether the principal place of business of the corporation was Louisiana, its nerve center and the situs of all of its operations, or North Dakota, its state of incorporation. *Id.* at 941. We held, of course, that Louisiana was the principal place of business. *Id.* at 942.

**11.** Village Fair Shopping Center was a partnership, the citizenship of which depended on the citizenship of each of its partners. *See Village Fair*, 588 F.2d at 433 n. 1; *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 456, 20 S.Ct. 690, 693, 44 L.Ed. 842 (1900). The defendant, a citizen of Mississippi, moved to dismiss on the ground that diversity was lacking since one of Village Fair's partners, ML Enterprises, Inc., was also a citizen of Mississippi. The corporation whose citizenship was at issue and to which we refer in our discussion of *Village Fair* therefore is ML Enterprises.

which Country Quality could buy its products. We also noted that Country Quality was vested with so little managerial authority that its highest-ranking employee "wore an apron," that is, "was primarily engaged in meat cutting activities." *Id.* at 315 n. 4. Even though Country Quality had its only contact with the public in Georgia, we looked at the operation as a whole. The scenario was similar to that of a "far flung" corporation [12] with a concentrated nerve center and diffuse places of activity. Country Quality's operations represented only a single location of the many locations of the corporate activities; the nerve center, however, was in one location. We therefore held that the principal place of business was Texas, the "nerve center" of the operation.[13]

■ Review of these cases makes clear that we have not analyzed our holdings in a manner that would provide an understanding of the "total activity" test that we have purportedly applied in this circuit to determine the principal place of business. It is clear, however, that the place of activity and the nerve center are two of the components of the "total activity" test. *See Village Fair*, 588 F.2d at 433–34. It is further apparent that our determination of the principal place of business begins with the general rules of these component tests: (1) when considering a corporation whose operations are far flung, the sole nerve center of that corporation is more significant in determining principal place of business, *see Toms*, 610 F.2d at 315; (2) when a

corporation has its sole operation in one state and executive offices in another, the place of activity is regarded as more significant, *see Anniston*, 216 F.Supp. at 475–76; but (3) when the activity of a corporation is passive and the "brain" of the corporation is in another state, the situs of the corporation's "brain" is given greater significance, *see Village Fair*, 588 F.2d at 434. These general rules, however, are only a starting point. In each case we must fully examine the corporation's operations and its nerve center in the context of the organization of that business.

■ In evaluating the "activity" of the corporation in question, one factor we must consider is the nature of the activity: whether it is active or passive and whether it is labor-intensive or management-demanding. We must consider the number of locations where the corporation carries on its activities; obviously, the *place* of operations of a corporation that carries on a single activity is more significant than one of many *places* of operations of a corporation with diffuse activities. Furthermore, we consider the importance of the particular activity to the corporate purpose and to the corporation as a whole; significant indicators of an activity's importance include the proportionate share of corporate assets, both of money and time, devoted to the activity and the proportion of its income that the corporation derives from that activity. We also see as significant the degree to which the corporation's activities bring it into contact with the community.[14]

---

**12.** Country Quality was a separate corporation and not a subsidiary.

**13.** The parties also cite *Frazier v. Alabama Motor Club*, 349 F.2d 456 (5th Cir.1965), as an example of our application of the total activity test to determine principal place of business. In *Frazier*, the defendants were motor clubs and automobile associations in various states, each of which had the same president, board of directors and stockholders. *Id.* at 459. The majority stockholder, National Enterprises, Inc., managed and supervised from its office in Atlanta all of the business of each corporation, and local managers of the corporations only solicited memberships, collected dues, and handled undisputed claims. *Id.* The issue in *Frazier*, however, was whether the defendants were "doing business" in the Northern District of

Georgia for venue purposes. *Id.* at 458. In that connection, we stated, "The evidence similarly points to the conclusion that the principal place of business of each of the defendants is in the forum district.... It cannot be successfully argued that a corporate defendant is not "doing business" in the district in which it maintains its principal place of business." *Id.* at 460. Therefore our statements in *Frazier* regarding the principal place of business are merely dicta, as it relates to a determination of diversity jurisdiction under 28 U.S.C. § 1332.

**14.** We recognized the significance of this factor in *Toms*, even though it was not ultimately determinative. We also note that the importance of this factor is addressed by the legislative history of section 1332(c). *See supra*, pp. 404–05.

In examining the corporation's local contacts, we look at the number of employees in the given locale and the extent to which the corporation participates in the community through purchase of products, supplies and services, sales of finished goods, and membership in local trade or other organizations.

 We must also evaluate the corporation's "nerve center" in the context of the corporation's organization. As demonstrated in *Toms*, a corporation's nerve center does not have to be located within the corporate shell, but can be found wherever the nerve center exists. In *Toms*, the activities and business of Country Quality were operated and directed by a closely affiliated but corporately separate management company. We therefore consider substance over form in determining the nerve center. We also consider the exclusivity of decision making of the nerve center and the degree of autonomy delegated to other locations. For example, in *Anniston*, although company officials with primary decision-making responsibility were located in New York, Alabama was the location of significant autonomous administrative functions and, as we ultimately held, the principal place of business. As we have earlier noted, nerve center considerations take on added significance when the activities of the corporation are far-flung or passive or management-oriented as opposed to labor intensive activities.[15]

 After we have considered the general rules of the "place of activities" test and the "nerve center" test in the light of the particular circumstances of a corporation's organization, we must balance the facts to determine the ultimate question: the location of the corporation's principal place of business.

Our balancing is well illustrated by *Village Fair*. In that case our examination of the organization of the corporation revealed that it conducted significant operations in Mississippi and California. However, although of significant value, these "activities" were of a passive nature. The corporation's New York offices made all executive and policy decisions, including the few relating to Mississippi and California and the more frequent decisions involving commercial paper investments in New York. In that case, the balance weighed in favor of New York, for New York was the place where all corporate decisions were made while Mississippi and California were merely the situs of investments that benefited from the New York decisions but did not generate any independent activity of the corporation.

## VII

 With this fuller understanding of the "total activity" test, we turn to the facts before us today. Our review of the district court's determination of principal place of business is limited, in that we reverse only if that determination is clearly erroneous. *Village Fair*, 588 F.2d at 434.

The district court found that Winona is the situs of by far the most significant number of Olson's employees as well as all of Olson's manufacturing and storage facilities. Additionally, the Winona office, through the supervision of its general manager, processes Olson's orders, maintains bookkeeping records, and sales showrooms, and coordinates employee training and grievance procedures. The district court further found that Olson's Chicago office handles the company's significant financial activities and insurance transactions and maintains Olson's corporate records. The district court weighed these facts and concluded that Winona was Olson's principal place of business.

We begin our review of the district court's finding by noting that Olson's sole manufacturing activity is in Winona, Mississippi, and its executive offices are located in Chicago. In such a situation, the place of activity is regarded as significant. *See Lurie*, 315 F.Supp. at 420; *Anniston*,

---

**15.** The considerations that we have noted in evaluating the corporation's nerve center and its place of activities are certainly not exhaustive. Because the question of principal place of business is so fact-intensive, these considerations may be expanded or contracted in any given case.

216 F.Supp. at 475–76. With this basic principle in mind, we proceed to examine the facts relating both to Olson's operations and nerve center.

Olson's sole activities are the operation of a single plant in Winona, and sale of the products manufactured there. Its plant is a labor-intensive activity and brings it into contact with the local community as employer and consumer and as a member of local and state trade associations. Olson's sales activities are conducted in various places, including Winona, particularly through part-time showrooms in Dallas and Atlanta.[16]

Olson's nerve center is located primarily in Chicago for it is there that primary financial and other management decisions are made; additionally, Olson's corporate records and major bank accounts are maintained in Chicago. Significant management decisions, however, are also made in Winona; these decisions involve scheduling production, hiring and firing of employees, employee grievances and workers compensation matters. Accounts receivable and payable are handled in Winona where some other corporate records and bank accounts are kept. Additionally, we note that the decisions made in Chicago are based on information initially compiled by the Winona facility.

Winona is therefore not only the locale of Olson's only substantial activity but also the place in which some significant business decisions are made. And, as we have noted, Winona is where the vast majority of Olson's employees are located, is where Olson is most visible, is where its products are manufactured, is where it has its most substantial investment, and indeed is where, more than any other place, its corporate purpose is fulfilled. Although decisions made in Chicago are clearly impor-

tant, they cannot outweigh the greater significance of the activities conducted in Winona. Thus, when we consider the total activity of Olson, the balance of the relevant factors demonstrates with force that Winona is the corporation's principal place of business. For these reasons, we hold that the district court did not err.

## VIII

Olson contends, in the alternative, that it is merely an alter ego of its parent Stamatakis, and for that reason, the principal place of business of its parent, Illinois, should be imputed to Olson. We need not decide whether Olson is the alter ego of Stamatakis, however, since, even if the alter ego could be established, our precedent bars this argument. In *Panalpina Welttransport GMBH v. Geosource, Inc.*, 764 F.2d 352, 354 (5th Cir.1985), we held that "the alter ego doctrine cannot be used to preserve diversity jurisdiction by ignoring the place of incorporation of the subsidiary and treating the subsidiary as if it were only a citizen of the state of incorporation of the dominant corporation." Whether this principle applies also to imputing the parent's *principal place of business* to the subsidiary was not before the court. The reasoning of *Panalpina*, however, leads only to the conclusion that Olson may not take advantage of the alter ego doctrine in this case.[17]

In *Panalpina*, we recognized that a corporation may, through consolidation with another entity or the alter ego doctrine, *gain* additional places of citizenship. 764 F.2d at 354. This we stated was consistent with congressional intent to restrict the availability of diversity jurisdiction. *Id.* We noted that "[a] party cannot, however, pick and choose among the places of citi-

---

**16.** Neither party contends that Atlanta or Dallas is Olson's principal place of business, and rightly so, as neither city contains substantial activity or corporate decision-making authority.

**17.** In *Burnside v. Sanders Ass'n, Inc.*, 507 F.Supp. 165 (N.D.Tex.1980), aff'd, 643 F.2d 389 (5th Cir.1981), we refused to impute the principal place of business of the parent to the subsidiary because the subsidiary was an independent

entity and was not the alter ego of its parent. 507 F.Supp. at 168. Because of the court's holding that the subsidiary was not the alter ego of the parent, the court was not required to decide whether the alter ego principle could be applied to create diversity jurisdiction. *Burnside*, which we note preceded *Panalpina*, does not conflict with our holding today.

zenship ignoring one or more in an effort to preserve diversity jurisdiction." *Id.*

Olson attempts to "pick and choose" here; for whatever reasons, Olson has chosen to be incorporated separately from its parent and has no doubt received benefits from that separate incorporation. Now, however, because its incorporation as a separate and independent entity is inconvenient, Olson wants us to ignore its separate identity and allow it to pick the jurisdiction for this lawsuit. Such an argument is contrary to the intent of Congress.

We hold then that the alter ego doctrine may not be used to create diversity jurisdiction by ignoring the principal place of business of a subsidiary corporation and imputing to it the principal place of business of the parent.[18]

For the reasons stated herein, the judgment of the district court is

AFFIRMED.

---

18. Olson relies on *Frazier,* 349 F.2d 456, in which we stated in dicta that the principal place of business of the subsidiary was the corporate headquarters of the parent and *Toms,* 610 F.2d 313, in which we held the principal place of business of the defendant corporation to be the corporate office of another corporation. Neither of these cases controls. In *Frazier* and *Toms,* we simply considered the total activities of the corporations and determined the principal place of business of the corporations. The alter ego doctrine was not at issue.