Jason **TUBBS**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY.**

**Civ. A. No. G–93–460.**

United States District Court,
S.D. Texas,
Galveston Division.

March 14, 1994.

Francis I. Spagnoletti, Spagnoletti & Assoc., Houston, TX, for plaintiff.

Danny Michael Chappell, Southwestern Bell Telephone Co., Bellaire, TX, for defendant.

### ORDER OF REMAND

KENT, District Judge.

Before the Court is the Plaintiff Jason Tubbs's supplemental motion to remand this personal injury action against the Defendant Southwestern Bell Telephone Company. For the reasons stated below, the motion is GRANTED.

The sole question the Court must determine is whether the Defendant's principal place of business under 28 U.S.C. § 1332(c) is Texas or Missouri. If the Defendant's principal place of business is Texas, this Court lacks subject matter jurisdiction over the case and must remand it to state court. The Plaintiff contends that the Defendant's principal place of business is Texas while the Defendant contends it is Missouri.

■ This question must be analyzed at the time suit was filed, May 17, 1993.[1] *Harris v. Black Clawson Co.*, 961 F.2d 547, 549 (5th Cir.1992). Moreover, since the Defendant is attempting to invoke this Court's jurisdiction, it has the burden to show that Texas is not its principal place of business. *Village Fair Shopping Ctr. Co. v. Sam Broadhead Trust*, 588 F.2d 431, 433 (5th Cir.1979).

The Plaintiff was injured when he came in contact with one of the Defendant's cables. The Defendant is a telecommunication public utility that is incorporated in Missouri and operates in Texas, Arkansas, Kansas, Missouri, and Oklahoma. In May 1993, about 56% of the Defendant's total operating reve-

---

1. This principle is especially important under the present analysis because in August 1993, only months after the Plaintiff filed suit, the Defendant initiated a major reorganization which drastically changed the relevant facts. Consequently, the Court will disregard the Plaintiff's evidence of facts that developed after the initiation of this reorganization.

nue was generated in Texas, and about 57% of the Defendant's customer bills were bills of Texas customers. Moreover, wages paid to Texas employees comprised over 50% of the total wages paid by the Defendant. On the other hand, Missouri operations generated only 17% of customer bills, 17% of the total operating revenue, and 27% of the total wages paid by the Defendant.

The Defendant had two operating divisions, the Texas Division, headquartered in Texas, and the Midwest Division. Ten of the Defendant's 31 officers and directors were based in Texas, including the Defendant's chairman-of-the-board/chief-executive-officer and secretary. The Texas Division headquarters was responsible for Texas regulatory activities, budgeting of revenues and expenses for Texas operations, and sales, installation, and maintenance of activities related to Texas customers.

Missouri contained the headquarters for the Midwest Division and the overall administrative headquarters for the Defendant. Eighteen of the Defendant's officers and directors were based in Missouri. Additionally, Missouri headquarters kept the corporate books and records and was responsible for company-wide information services and data processing which engaged a staff of 1,500 to 2,000. Missouri operations were responsible for all customer billing and accounting, management of company-wide legal affairs, primary banking relationships, federal regulatory affairs, and overall accounting, including payroll. Moreover, Missouri activities included the design of new technology and all technical planning.

About 59% of the Defendant's equipment and cable and 57% of its total assets were located in Texas. Three of the Defendant's area purchasing managers resided in Texas, the other two in Missouri and one in Kansas. These purchasing agents were responsible for the purchase of equipment and cable of the type that allegedly injured the Plaintiff.

They were authorized to issue purchase orders for amounts up to $50,000 (which included the majority of the Defendant's purchases) under the terms of supply contracts which were negotiated in Missouri. The equipment supplied for use in Texas was not necessarily manufactured there, but was delivered to Texas directly from the manufacturers. About 57% of the Defendant's equipment purchases were for Texas.

Alternatively, Missouri contained about 15% of the Defendant's equipment and cable and about 17% of the Defendant's total assets. Contracting managers in Missouri were responsible for negotiating contracts with company-wide suppliers and also promulgated company-wide practices and procedures for purchasing.[2]

■ The Fifth Circuit has stated that, in determining a corporation's principal place of business, a court must apply the "total activity" test, which incorporates both the "nerve center" test and the "place of activity" test. *Harris*, 961 F.2d at 549; *J.A. Olson Co. v. City of Winona*, 818 F.2d 401, 404 (5th Cir. 1987); *Village Fair*, 588 F.2d at 434.

> [U]nder the "nerve center" test, the state in which the corporation has its nerve center, or "brain," is its principal place of business, and under the "place of activity" test, the state in which the corporation carries out its operations is its principal place of business.

*J.A. Olson*, 818 F.2d at 404. Although these two tests seemingly conflict, they are actually harmonious because they are applied in different factual situations, dependent upon the organization of the business entity under consideration. *Id.* at 404. In other words, the court considers:

> the general rules of the two tests in light of the particular circumstances of a corporation's organization [and] balances the facts [of the particular case before it] to

---

**2.** The Court agrees with the Defendant that the location of its parent is irrelevant to the present analysis. "It is well established that a subsidiary corporation which is incorporated as a separate entity from its parent corporation is considered to have its own principal place of business. Of course, the subsidiary takes the citizenship of the parent when it is not really a 'separate entity.'" *Fitzgerald v. Seaboard Sys. R.R.,* 647 F.Supp. 205, 208 (S.D.Ga.1985); *accord* 13B Wright, Miller, & Cooper, *Federal Practice and Procedure,* § 3625 pp. 635–36 (2d ed. 1984). The Plaintiff has produced no evidence or even alleged that the Defendant and its parent are not separate entities.

determine ... the location of the corporations's principal place of business. *Harris*, 961 F.2d at 549 (quoting *J.A. Olson*, 818 F.2d at 412) (alterations and omission in the original).

■ The nerve-center test was originally enunciated in *Scot Typewriter Co. v. Underwood Corp.*, 170 F.Supp. 862, 865 (S.D.N.Y. 1959), and is applied when the corporation is engaged in far-flung and varied activities which are carried on in different states. *J.A. Olson*, 818 F.2d at 407 (noting that *Lugo–Vina v. Pueblo Int'l, Inc.*, 574 F.2d 41, 43 n. 2 (1st Cir.1978), states that the nerve center test is most appropriately applied to holding companies). Under this test, the state which hosts the nerve center is the principal place of business because "the corporation's activities are dispersed to the point that no place in which the corporation conducts operations or activities can be denoted 'principal.'" *J.A. Olson*, 818 F.2d at 407.

■ The place-of-activity test was first enunciated in *Kelly v. United States Steel Corp.*, 284 F.2d 850 (3d Cir.1960), and is applied when the corporation has a collection of "nerve cells serving the common function of making the corporate enterprise go." *Id.* at 853; *J.A. Olson*, 818 F.2d at 408. Under this situation, the principal place of business of a corporation with significant administrative authority and activity in one state and lesser executive offices but principal operations in another state is generally the district of the latter. *J.A. Olson*, 818 F.2d at 408.[3]

■ Based upon the present factual situation, the Court concludes that the Defendant's organizational structure is more closely analogous to the corporations who are principally analyzed under the place-of-activity test. The Defendant operated uniformly throughout five states providing telecommunication services. Texas accounted for over 55% of all of the Defendant's activities and assets while Missouri accounted for less than 20%. Additionally, these two states contained "nerve cells": the Defendant's administrative offices and the Midwest Division headquarters were located in Missouri which engaged 18 of the Defendant's top executives and directors while the Texas Division headquarters were located in Texas which engaged 10 of the Defendant's top executives and directors, including the Defendant's chief executive officer and chairman of the board.

Consequently, the Defendant's principal place of business will most likely not be Missouri, the state with significant administrative authority and some activity, but will likely be Texas, the state with lesser executive offices but principal operations. *Id.* at 408; *Barrantes Cabalceta v. Standard Fruit Co.*, 667 F.Supp. 833, 834 (S.D.Fla.1987), *aff'd*, 883 F.2d 1553 (11th Cir.1989).

The Court does not find that the Defendant is engaged in far-flung and varied activities which would render its principal nerve center, Missouri, the determinative factor in the present analysis because the Defendant is a public utility which provides one uniform service over a five state area. However, the location of the Defendant's nerve center is still an important consideration which favors Missouri as the location of the Defendant's principal place of business. *J.A. Olson*, 818 F.2d at 411; *Taber Partners v. Insurance Co. of N. Am.*, 798 F.Supp. 904, 911 (D.P.R. 1992), *rev'd on other grounds sub nom., Taber Partners v. Merit Builders, Inc.*, 987 F.2d 57 (1st Cir.1993), *cert. denied*, —— U.S.

---

**3.** The Defendant cites *J.A. Olson*, and quotes, "the principal place of business of a corporation with significant administrative authority and activity in one state and lesser executive offices but principal operations in another state is generally the district of the *former*." *J.A. Olson*, 818 F.2d at 409 (emphasis added). But, the Fifth Circuit's use of the word "former" instead of "latter" is obviously a typographical error because the statement as written is contrary to *Kelly*, which the court cited to support this statement, and is contrary to the synopsis of *Kelly* as explained in *J.A. Olson* at pages 408–09. *See Barrantes Cabalceta v. Standard Fruit Co.*, 667 F.Supp. 833,

834 (S.D.Fla.1987) (using the same language in *J.A. Olson* but stating that the principal place of business is the "latter," the state with the lesser executive offices but principal operations).

The Defendant openly admits in its brief that it fits perfectly into this fact situation, but based upon the noted error in *J.A. Olson*, the Defendant erroneously concludes that its principal place of business is Missouri, the state containing "significant administrative authority and [some] activity." Consequently, implicit in the Defendant's argument is its agreement that Texas is its principal place of business because it contains "lesser executive offices but principal operations."

——, 114 S.Ct. 82, 126 L.Ed.2d 50 (1993); *see White v. Halstead Indus.,* 750 F.Supp. 395, 399 (E.D.Ark.1990) ("When no one state is clearly the center of corporate activity, *or accounts for the majority of the corporation's income,* the headquarters and location of the corporate policy-making functions assume greater importance." (emphasis in the original)); *North Star Hotels v. Mid–City Hotels Assocs.,* 696 F.Supp. 1265, 1270, 1271 (D.Minn.1988) (using the same language quoted in *White, supra* ); *Mahoney v. Northwestern Bell Tel.,* 258 F.Supp. 500, 502 (D.Neb.1966) (using almost identical language as that quoted from *White, supra* ), *aff'd,* 377 F.2d 549 (8th Cir.1967).

Moreover, although Missouri certainly contained most of the Defendant's nerve center, it did not contain it all. Texas contained a significant portion of the nerve center which had substantial autonomy over Texas operations: it was responsible for Texas regulatory activities, budgeting of revenues and expenses for Texas operations, sales, installation, and maintenance of activities related to Texas customers, and significant purchasing power for equipment used in Texas. These considerations are important factors under the present analysis and meaningfully favor Texas as the location of the Defendant's principal place of business *J.A. Olson,* 818 F.2d at 410, 412.

Also extremely significant in the Court's determination is that Texas not only accounts for a substantial amount of the Defendant's revenues, employees, assets, and customers, but Texas accounts for a clear *majority* of these items. *Grinter v. Petroleum Operation Support Serv.,* 846 F.2d 1006, 1008 (5th Cir.1988) (stating that the following factors where "significant" in determining a corporation's principal place of business: the state where the majority of the corporation's employees lived and worked, where the majority of its property was located, and where the majority of its operations were conducted), *cert. denied,* 488 U.S. 969, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); *see Village Fair,* 588 F.2d at 434 (finding that the location of the aggregate assets of an entity was a significant, although not conclusive, factor under the total-activity test); *Inland Rubber Corp.*

*v. Triple A Tire Serv.,* 220 F.Supp. 490, 494 (S.D.N.Y.1963) (stating "if any one state contains a substantial predominance of corporate operations, including personnel, as compared with any other single state, then in that state lies the 'principal place of business'...."); *see generally* 13B Wright, Miller, & Cooper, *Federal Practice and Procedure,* § 3625, n. 22 (2d ed. 1984 & Supp.1993).

Two cases are especially helpful in giving the Court guidance in the present analysis. In *Industrial Tectonics, Inc. v. Aero Alloy,* 912 F.2d 1090 (9th Cir.1990), the Ninth Circuit held that "where a majority of a corporation's business activity takes place in one state, that state is the corporation's principal place of business, even if the corporate headquarters are located in a different state." The court was analyzing whether California or Michigan, the only two states in which the corporation operated, was the principal place of business. Even though Michigan contained the company headquarters and had substantial operations, the court chose California because it accounted for over 60% of the corporation's fiscal sales, operating income, receivables, and inventories. Also, the California plant was over twice the value of the Michigan plant, contained over 63% of the corporation's equipment, and employed more than half of the corporation's employees. *Id.* at 1094.

Moreover,

when a corporation divides its operations among more than one state, but its activities in one of those states clearly exceeds all of the activities in other states, the state with the largest volume of operations is the principal place of business.

13B Wright, *supra,* at § 3625 pp. 628–29.

This principle was applied in *White v. Halstead Industries,* 750 F.Supp. 395 (E.D.Ark. 1990). In *White,* the corporation operated in many states and maintained its administrative office in North Carolina, but it had two Arkansas plants which manufactured the majority of the corporation's goods which produced the majority of the corporation's sales. Furthermore, a majority of the corporation's employees were located in Arkansas. Because of these factors, the court gave less weight to the location of the corporation's

executive offices and concluded that under the total-activity test, Arkansas was more likely to be the corporation's principal place of business than North Carolina. *Id.* at 399.

After carefully balancing all of the relevant factors, the Court concludes that under the total-activity test, Texas is the Defendant's principal place of business. Most importantly, when this suit was filed, Texas contained a significant number (almost one-third) of the Defendant's top officers and executives and Texas activities accounted for a majority (and well over two times more than that in Missouri) of the Defendant's total operating revenue, customers and their bills, employees and their wages, and total assets. Furthermore, the officers and executives and other managers in Texas had significant autonomy to oversee and control Texas operations.[4]

Furthermore, the Defendant is so physically and tangibly pervasive throughout all five states that for diversity purposes it is only logical to give the sheer number of individuals that could be affected by the Defendant's presence great weight in determining citizenship. In the present case, about 59% of the Defendant's equipment and cable and 57% of its total assets were located in Texas. This means that more people in Texas were, and probably still are, susceptible to the type of injury suffered by the Plaintiff than the combined number of individuals in the four other states serviced by the Defendant.

Common sense, in light of the purpose behind diversity jurisdiction, also dictates that the Defendant should be considered a citizen of Texas. The Defendant is a public utility and provides telecommunication services to virtually every citizen of Texas. The Defendant is probably the second most well-known entity in Texas, right behind God, and literally reaches out and touches almost every citizen of Texas, at least several times a day, through its telephone service. This substantial, if not universal, visibility in Texas is a proper factor to consider under the present

analysis and overwhelmingly weighs in favor of Texas as the Defendant's principal place of business. *J.A. Olson,* 818 F.2d at 406, 411; *see North Star Hotels,* 696 F.Supp. at 1272 (stating that a corporation should be deemed a citizen of the state where its public contacts are greatest); *accord* 13B Wright, *supra,* at § 3625 p. 632.

It is anomalous to think that the Defendant would not be treated fairly in a Texas state court, considering its virtual universal visibility, and to conclude so would be inimical to the purposes of federal diversity jurisdiction. *See J.A. Olson,* 818 F.2d at 406; *Industrial Tectonics,* 912 F.2d at 1094; *Force v. E.I. DuPont de Nemours,* 770 F.Supp. 335, 337 (E.D.Tex.1991) (noting that Texaco, Inc., which was pervasive throughout the relevant county, was not the sort of out-of-state litigant in need of a forum free of local bias).

As the Fifth Circuit has stated:

> The 1958 amendments to 28 U.S.C. § 1332(c) were intended to provide to out-of-state litigants a forum free of local bias. . . . Any local prejudice is minimized when a corporation, even though incorporated in another state, has significant contact with the district. . . . In such a situation, the foreign corporation has some identity and familiarity with the people and the courts in the locality. Since the need for diversity jurisdiction is lessened when a foreign corporation has substantial visibility in the community, then our analysis should include consideration of the corporation's contact with the community.

*J.A. Olson,* 818 F.2d at 406.

As in *North Star Hotels,* this Court concludes:

> section 1332(c) was clearly designed to reduce the number of cases coming to federal courts on the ground of diversity citizenship. That goal is furthered by [this Court's] analysis. By finding [Texas] to be

---

4. It is notable that the original version of the 1958 amendment to § 1332(c) would clearly have rendered the Defendant in this case a citizen of Texas. The original version stated that a corporation's principal place of business would be any state in which the corporation earned more than half of its gross income. *J.A. Olson,*

818 F.2d at 405; *Inland Rubber,* 220 F.Supp. at 494. However, this version was altered to the statute's present form, which is similar to an analogous provision in the Bankruptcy Act, to aid the courts in its application. *J.A. Olson,* 818 F.2d at 405; *see generally* 13B Wright, *supra,* at § 3625 pp. 631–633.

[the Defendant's] principal place of business, the Court will be required to dismiss this action for lack of subject matter jurisdiction. Such a result is consistent with the limited nature of federal jurisdiction which traditionally has been narrowly construed.

*North Star Hotels,* 696 F.Supp. at 1272.

For these reasons, the Court finds that Texas is the Defendant's principal place of business for diversity purposes, and thus, the Defendant is a citizen of Texas under 28 U.S.C. § 1332(c). Consequently, because this action is based upon diversity jurisdiction, which does not exist, this Court lacks subject matter jurisdiction over this controversy. The Plaintiff's motion is GRANTED, and this matter is ORDERED to be REMANDED to the 239th District Court of Brazoria County, Texas.

IT IS SO ORDERED.