**WILLIAMS PIPE LINE CO., a Delaware corporation, Plaintiff,**

v.

**CITY OF MOUNDS VIEW, MINNESOTA, an incorporated municipality, Jerome W. Linke, its Mayor, Donald F. Pauley, its Clerk-Administrator, Barbara A. Haake, Susan Hankner, Phyllis Phyllis I. Blanchard, and Gary C. Quick, members of the Mounds View City Council, Defendants.**

**COUNTY OF RAMSEY, Plaintiff,**

v.

**WILLIAMS PIPE LINE COMPANY, Defendant.**

**CITY OF MOUNDS VIEW, Plaintiff,**

v.

**WILLIAMS PIPE LINE COMPANY, Defendant.**

**Civ. Nos. 4–86–648, 4–86–651 and 4–86–656.**

United States District Court, D. Minnesota, Fourth Division.

Aug. 22, 1986.

O'Connor & Hannan by William E. Flynn and Lawrence E. Meuwuissen, Minneapolis, Minn., and Hall, Estill, Hardwick, Gable, Collingsworth & Nelson by Frank M. Hagedorn and Mark K. Blongewicz, Tulsa, Okl., for Williams Pipe Line Co.

Tom Foley, Co. Atty., and by Michele L. Timmons, Chief, Civ. Div., and by Beth Sullivan and David MacMillan, Assts., St. Paul, Minn., for Ramsey County.

Richard Meyers, St. Paul, Minn. and Eric W. Valen, St. Paul, Minn., for City of Mounds View.

DIANA E. MURPHY, District Judge.

On July 8, 1986, a portion of a petroleum pipeline owned by Williams Pipeline Company (Williams) failed. An explosion and fire killed two people and badly injured another in Mounds View, a city located in Ramsey County, Minnesota. The accident also caused property damage. In the weeks since the explosion, the parties to these actions and others have disputed how, when and whether the pipeline should be tested and restarted.

On July 13, Williams filed *Williams Pipe Line Co. v. City of Mounds View* in this

court. Both sides to that action now seek a temporary restraining order (TRO). Williams asks that the court restrain Mounds View from enforcing ordinances passed after the accident or otherwise interfering with its test preparations and testing of the pipeline. Mounds View seeks an order restraining Williams from conducting hydrostatic testing or resuming pipeline operations. Also on July 13, Ramsey County filed *County of Ramsey v. Williams Pipe Line Co.* in state court; Williams removed the action to this court. Ramsey County then moved to remand to state court or, in the alternative, for a TRO prohibiting testing of the pipeline. Williams has moved for a TRO prohibiting the county from hindering testing efforts. On August 14, Mounds View filed *City of Mounds View v. Williams Pipe Line Co.* in state court, and Williams removed it to this court. Mounds View has also moved to remand or, in the alternative, for a TRO prohibiting Williams from testing or operating the pipeline. Thus there are two motions to remand and five TRO motions in the three related cases now before the court.

*Background*

The parties and the Office of Pipeline Safety (OPS) of the United States Department of Transportation (DOT) have investigated the accident and taken various actions in regard to testing and possibly restarting the pipeline.

On the day of the accident, the Mounds View City Council adopted an ordinance prohibiting Williams from restarting the pipeline until the city received assurances that its residents were safe and until Williams paid all property damage claims. This July 8 ordinance also threatened fines and imprisonment for anyone who attempted to restart the pipeline without council approval. A second ordinance, dated July 14, amended the municipal code to require a permit for the construction, reconstruc-

tion, or repair of pipelines transporting flammable products; it also required a hearing with two weeks notice before the granting of such a permit.

Ramsey County claims it has retained property rights which are pertinent to this situation. A 1957 resolution by the county board granted Williams' predecessor permission to place the pipeline in a county easement. The resolution provided that the pipeline company was to "remove, reinstall or replace [the pipe] when in the opinion of the County Engineer or of the Board of County Commissioners such removal, installation or replacement shall be advantageous to the people of [the] County." The pipeline company was also to give notice of any excavation, maintenance or removal and to perform such work under the direction, control and supervision of the county engineer. The county engineer had the right to "make all rules with respect to possible hazards as he shall deem necessary or advisable." A resolution passed on July 28, 1986 reserved to the board the authority previously delegated to the county engineer.

Shortly after the accident, the OPS began an investigation. On July 11, it issued a "final order" directing Williams to take certain measures before resuming operation of the pipeline and to restrict operations once they were commenced. The "corrective action" to be taken includes hydrostatic testing of the entire line at 1900 psig, visual examination of failures, and metallurgical examination of seam failures. An OPS official is to oversee and approve the operations. After Williams receives approval, it is to operate the pipeline at the reduced pressure of 900 psig until it can demonstrate that the line would be safe at higher pressure. Since OPS issued this final order, the National Transportation Safety Board (NTSB) has questioned some elements of the OPS order.[1] It is

1. The NTSB recommends that the testing be performed at 2,200, rather than 1,900 psig. It states that OPS's final order did not address "the potential effects of the pressure reversal phenomenon,.... in which a defect in a pipeline

may survive a given test pressure only to fail upon subsequent pressurization at a level below that of the previous test." The NTSB also expressed concern about OPS's preliminary conclusion that corrosion was not a significant

possible that the order will be amended in the near future.

Williams has also taken action since the accident. It has hired two consultants, Parker Engineering Associates, Inc. and Battelle-Columbus Division, to help it design a testing program. Williams officials characterize the program as unusually extensive. Williams' general manager testified that the program will require approximately two weeks of preparation before hydrostatic testing can begin. The entire testing program should take approximately six to eight weeks.

The parties to these cases have been meeting with OPS and NTSB personnel and other interested persons. The court anticipates that such meetings may continue during the pendency of this litigation.

## A. The Motions to Remand

Both Ramsey County and Mounds View have moved to remand the cases they brought to state court. The county and city argue that Williams has not demonstrated either federal question or diversity jurisdiction.

Federal district courts have "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000 ... and is between ... citizens of different states...." 28 U.S.C. § 1332. Ramsey County and Mounds View concede that there is diversity of citizenship in these actions. They argue, however, that Williams has not demonstrated the requisite amount in controversy. The county and city have not sued for money damages, but solely for injunctive relief. Under the circumstances, they argue, the controversy cannot be said to be worth more than $10,-000.

■■■ Statutes conferring jurisdiction are to be strictly construed, and the party asserting federal jurisdiction must bear the burden of proving that jurisdiction does lie. E.g., Gibbs v. Buck, 307 U.S. 66, 59 S.Ct.

725, 83 L.Ed. 1111 (1939). But a court should not find that it lacks jurisdiction because the amount at stake is too small unless "it appear[s] to a legal certainty that the claim is really for less than the requisite jurisdictional amount." *Saint Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938). "[W]hen relief other than a monetary judgment is demanded, the plaintiff cannot defeat removal simply by characterizing the claim as involving less than the requisite amount when the court is informed that the value of the interest to be protected exceeds the amount in controversy." 14A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3725 (2d ed. 1985). In an action for injunctive or equitable relief, the "amount in controversy may be tested by the value of the right sought to be gained by the plaintiff." *Hedberg v. State Farm Mutual Automobile Insurance Co.*, 350 F.2d 924, 928 (8th Cir.1965) (Blackmun, J.). Ramsey County seeks to protect its property interest in its right of way; it is unquestionable that this property right is worth far in excess of $10,000. Mounds View asserts an action based on public nuisance; it seeks to protect the safety and property of its citizens. The rights at stake are worth in excess of $10,000.

The complaints filed in state court are facially sufficient to invoke diversity jurisdiction. It is therefore unnecessary to consider whether Williams' counterclaims are of any jurisdictional import or whether federal question jurisdiction lies.

## B. The Motions for Temporary Restraining Orders

Four factors determine whether temporary injunctive relief is appropriate: (1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between that harm and any injury that the temporary relief would in-

factor in the failure. NTSB found the evidence insufficient to reach such a conclusion and recommends more complete metallurgical testing to determine whether corrosion is a problem.

Finally, NTSB questions OPS's willingness to authorize operation at 900 psig before completion of testing and analysis of the resulting data.

flict on other parties; and (4) the public interest. *Dataphase Systems, Inc., v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). A TRO is an extraordinary remedy and the burden is on the moving party to demonstrate that it is entitled to the relief.

### 1. Mounds View's Motion

Mounds View seeks a temporary restraining order in its own action against Williams and in the action brought by Williams. It wants Williams to be restrained from conducting hydrostatic testing as ordered by the OPS on July 11, 1986 and from resuming pipeline operations within the city pending a final decision on the merits. Mounds View's complaint asserts a claim for public nuisance. It states that "the testing and starting of [Williams'] inherently defective pipeline ... would be an act which unreasonably endangers the safety, health and welfare of the citizens of Mounds View." The ultimate relief sought is an order enjoining Williams from ever testing its pipeline or renewing operations and ordering Williams to remove the pipeline from the city.

 The Hazardous Liquid Pipeline Safety Act (HLPSA), 49 U.S.C. § 2001, *et seq.,* gives the Secretary of DOT the authority to regulate interstate pipeline transportation and safety. The HLPSA provides in part:

> Any State agency may adopt additional or more stringent safety standards for intrastate pipeline facilities and the transportation of hazardous liquids associated with such facilities, if such standards are compatible with the Federal standards issued under this chapter. No State agency may adopt or continue in force any safety standards applicable to interstate pipeline facilities or the transportation of hazardous liquids associated with such facilities.

49 U.S.C. § 2002(d). The statute does not preempt all state laws touching upon the operation of pipelines, but the federal statute clearly overrides state law with which it is in conflict. *Cf., Northern Border Pipeline Co. v. Jackson County,* 512 F.Supp. 1261 (D.Minn.1981). The relief which Mounds View seeks appears to conflict directly with the authority which the HLPSA grants to DOT. At this time, it appears unlikely that Mounds View will prevail on the merits of its case.

In its complaint, Mounds View argued that its citizens would be injured because the proposed high pressure hydrostatic testing would further weaken already defective pipeline and because the renewed transportation of hazardous materials would threaten their safety and property. At the hearing, however, Mounds View argued that it would be harmed by William's plan to test at a pressure insufficiently high to detect defects in the pipeline.[2] Testimony received at the hearing indicates that petroleum products would not be transported through the pipeline until after the projected tests are completed, at least six to eight weeks in the future. Even the hydrostatic testing cannot occur until after preparation which takes at least two weeks. Mounds View has not demonstrated or even argued that the preparations necessary for hydrostatic and other testing will cause any harm, much less irreparable harm.

Mounds View has failed to show that it is likely to prevail on the merits or that it will be irreparably harmed by Williams activities in preparation for high pressure testing of the pipeline. Under these circumstances, the balance of harms and the public interest do not favor issuance of the TRO Mounds View seeks.

### 2. Ramsey County's Motion

The county seeks a TRO to prohibit Williams from entering upon its property for the purpose of installing, repairing, or testing any pipeline until such time as it

---

**2.** Williams hydrostatically tested the entire pipeline in 1984 at pressures ranging from 1,700 to 2,125 psig. The July 8, 1986 failure occurred at a pressure less than 1,500 psig. *See* note 1 *supra.* Sections of Williams' pipelines have failed in Minnesota on other occasions, but it is unclear what relation these failures may have to these cases, if any.

grants specific permission to do so and in accordance with any governing rules it may establish. The county's complaint is rooted in property law. It argues that it gave Williams' predecessor pipeline company a revocable license to use the county's right of way and that it may now rescind or condition that license. Ramsey County gave the license to build the pipeline in 1957, before the enactment of the HLPSA. Williams argues that the HLPSA preempts county regulation of the operation of the section of the pipeline that runs through its right of way. *Cf. Northern Border Pipeline Co. v. Jackson County,* 512 F.Supp. 1261 (D.Minn.1981) (Natural Gas Pipeline Safety Act preempted county's authority to condition permit for construction of gas line on requirement that it be buried a minimum of six feet under ground). It appears that Williams has a strong preemption argument; the county has not shown that it is likely to prevail on the merits.

The county asserts that it does not object to testing *per se.* Rather, it seeks to protect its property rights. The record in these actions demonstrates that the county has not voluntarily waived any such rights; they are protected in that respect. Furthermore, preparation for testing would not cause irreparable injury to the county's property interests. Thus, the balance of harms and the public interest do not favor issuance of a restraining order in favor of the county.

### 3. The Motion of Williams Pipe Line Co.

■ Williams seeks a TRO restraining the city and the county from enforcing ordinances or otherwise interfering with efforts to prepare to test the line and to complete the tests. At this time, Williams only seeks to proceed with its test program.

Williams argues that it is bound to follow the OPS final order which directs it to take certain steps to test the line. It further argues that the HLPSA explicitly or implicitly preempts the efforts of the city and county to regulate the testing and operation of the pipeline and that those efforts are unconstitutional burdens on interstate commerce. The issues raised in this litigation are complex ones. The accident and the need to prevent future accidents are matters of considerable importance and concern. On the basis of the limited evidence now before the court, however, it appears likely that Williams will prevail on the merits of at least some of its claims.

Williams' general manager of pipeline operations testified that the hydrostatic testing directed by OPS cannot be conducted once freezing temperatures set in.[3] The testing program is scheduled to take six to eight weeks, so Williams is under time pressure to proceed. If it is unable to complete the testing, it will not be able to use the pipeline to transport petroleum products this winter.[4] This would mean economic loss for Williams, of course, and Northeastern Minnesota would be hard hit. The record indicates the pipeline is the major source of fuel oil in that area. Williams has demonstrated a real need to begin its preparations for testing while the parties and others discuss possible resolution of their disputes. Williams has not, however, demonstrated an overriding need to commence actual testing before the court has had an opportunity to consider a more fully developed record at the preliminary injunction hearing.

The county and city have not raised any questions about dangers relating to the testing preparations. It appears that the balance of harms clearly favors a TRO restraining the county and city from interfering with Williams' efforts to make preparations for testing.[5] The parties have

---

**3.** Minnesota Pollution Control Agency regulations prohibit the use of anti-freeze agent in the hydrostatic testing water.

**4.** Testing might indicate, of course, that the pipeline should not be used this winter. That remains to be seen.

**5.** Williams represented that the preparations did not involve high pressure use of the pipeline;

raised some questions about possible dangers of the hydrostatic testing, however. On the record now before the court, Williams has not demonstrated that any injury caused by a brief delay in testing will outweigh any injury that the testing itself might cause. At this time, the court will not restrain the county and city from attempting to delay testing or reopening of the pipeline. The public interest also favors this result. It will permit Williams to prepare to test and ensure that it is not so far behind schedule that safe winter operation is impossible. It will also permit the parties and the other interested persons to try to work out a mutually satisfactory testing program.

### C. Hearing on Preliminary Injunctions

A hearing on all preliminary injunction motions will be held on Wednesday, September 17 at 9:00 a.m.[6] Williams can use the intervening time to prepare for testing. In the meantime, the July 11, 1986 order of OPS may be amended. The parties agree that hydrostatic testing is the state of the art, so it is possible they may work out a testing program satisfactory to all in the interim.

Accordingly, based upon the above and all the files, records, and proceedings herein

IT IS HEREBY ORDERED that:

1. The motion of the City of Mounds View to remand Civ. No. 4–86–656 is denied.

2. The motion of the County of Ramsey to remand Civ. No. 4–86–651 is denied.

3. The motion of the City of Mounds View for a temporary restraining order in Civ. Nos. 4–86–648 and 4–86–656 is denied.

4. The motion of the County of Ramsey for a temporary restraining order in Civ. No. 4–86–651 is denied.

5. The motion of Williams Pipe Line Co. for a temporary restraining order in Civ. Nos. 4–86–648 and 4–86–651 is granted in the following respect:

a. The City of Mounds View, Jerome W. Linke, Donald F. Pauley, Barbara A. Haake, Susan Hankner, Phyllis I. Blanchard, Gary C. Quick, and all their employees and agents are prohibited from hindering or interfering with testing preparations not including any high pressure use of the pipeline by Williams Pipe Line Co.;

b. The County of Ramsey and all its employees and agents are hereby prohibited from hindering or interfering with testing preparations not including any high pressure use of the pipeline by Williams Pipe Line Co.;

The motion is denied in all other respects until further order of the court.

6. This order shall become effective when Williams Pipe Line Co. posts a bond in the amount of $10,000.00.

7. This order shall remain effective until further order of the court. All motions for preliminary injunctions shall be heard at 9:00 a.m. on Wednesday, September 17, 1986.

8. Any party seeking a preliminary injunction shall serve on the court and opposing counsel any papers in support of its motion by Wednesday, September 3, 1986. Any party opposing a motion for a preliminary injunction shall serve on the court and opposing counsel any papers in opposition to the motion by Wednesday, September 10, 1986.

---

the court's order is premised upon this assurance.

6. Under Fed.R.Civ.P. 65(b), a TRO shall expire within 10 days unless it is extended for an additional 10 days for good cause shown or unless the restrained party does not object to an extension. A temporary restraining order may be in substance a preliminary injunction, however. Its issuance is discretionary, and the court's findings are subject to the clearly erroneous standard. *Edudata Corp. v. Scientific Computers, Inc.*, 746 F.2d 429, 430 (8th Cir.1984). If any party objects to extension of the restraining order until the injunction hearing, it may schedule a motion with the Honorable James M. Rosenbaum if this court is unavailable.