**NORTH STAR HOTELS
CORPORATION,
Plaintiff,**

v.

**MID–CITY HOTEL
ASSOCIATES, Defendant.**

**Civ. No. 4–87–793.**

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 7, 1988.

**1266**

Denis E. Grande, Arthur, Chapman & McDonough, P.A., Minneapolis, Minn., for plaintiff.

Jerome B. Pederson, Daniel J. Maertens, Fredrickson & Byron, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant's motion to dismiss for lack of subject matter jurisdiction and plaintiff's motion to amend its complaint to properly allege diversity jurisdiction.

FACTS [1]

This lawsuit involves a dispute arising out of a hotel management agreement entered into by plaintiff North Star Hotels Corporation (North Star) and defendant Mid–City Hotel Associates (Mid–City) on September 11, 1978. Pursuant to the terms of the management agreement, North Star was granted "the sole and ex-

clusive right to supervise and direct the management and operation" of the Hilton Hotel located at 1330 Industrial Boulevard, Minneapolis, Minnesota (hereinafter referred to as the Hotel), which is owned by Mid–City. Under the management agreement, North Star was required to render technical assistance to Mid–City regarding pre-opening planning and construction of the Hotel and was to perform management duties including:

(a) hiring, promoting, discharging and supervising all employees of the Hotel;

(b) contracting for all utilities, maintenance and other services which North Star deemed necessary for the proper operation and maintenance of the Hotel;

(c) making all repairs and improvements to the Hotel as were necessary for its proper maintenance;

(d) purchasing such supplies as North Star deemed necessary or advisable for the operation of the Hotel;

(e) applying for, obtaining and maintaining all licenses and permits required of the owner (Mid–City) or manager (North Star) in connection with the operation and management of the Hotel;

(f) establishing and maintaining bank accounts for the Hotel, collecting and depositing in such accounts all monies received from the operation of the Hotel, and making all expenditures from such accounts as were required in connection with the ownership, maintenance and operation of the Hotel; and

(g) doing or causing to be done all acts and things in and about the Hotel as were necessary to comply with all legal and insurance requirements.

*See* Management Agreement par. 4.01–4.05, 6.01–6.07.

At the time the parties entered into the management agreement, they also executed a management fee rider which set forth the compensation to be received by North Star for its services. The management fee rider provided that North Star would be compensated based on the Hotel's

---

**1.** This section incorporates relevant parts of the statement of facts contained in the Court's March 8, 1988 order.

gross revenues or gross operating profits, with North Star receiving the greater of a defined percentage of gross revenues or a floating percentage of gross operating profit. From 1978 through December 2, 1987, North star acted as manager of the Hotel and was compensated according to the parties' agreement.

Plaintiff alleges that as early as November 1984 Dr. Harry A. Johnson, Jr., one of Mid–City's general partners, expressed a desire to buy out North Star's interest in the management agreement. Plaintiff alleges that Johnson wished to sell the Hotel and considered the management agreement to be an impediment to such a sale.[2] Throughout 1985, 1986 and early 1987 the parties conducted intermittent negotiations regarding a possible buy-out by Mid–City.

The parties could not, however, reach an agreement.

By letter dated June 19, 1987, Mid–City notified North Star of what it viewed to be certain acts and omissions on the part of North Star which allegedly constituted a default under paragraph 7.01 of the management agreement.[3] Under the management agreement, if a default continued for a period of sixty days after notice, Mid–City had the right to terminate the agreement upon ninety days' written notice. By letter dated September 3, 1987, Mid–City notified North Star that the management agreement would terminate upon expiration of ninety days.

On September 4, 1987, North Star commenced this action, alleging that Mid–City's actions were wrongful and constituted a breach of contract.[4] In its complaint North

---

**2.** Paragraph 8.04 of the management agreement provides in part that

> Should Owner sell, lease or otherwise transfer or assign its ownership interest in the Hotel or its interest in this Agreement within fifteen (15) years of the opening of the Hotel, such sale, lease or transfer of the Owner's interest will be subject to this Management Agreement and the Management Fee Rider and all of the terms and provisions thereof. Unless otherwise agreed to by Manager, any successor in interest to Owner will be bound by the terms and provisions of this Agreement until the expiration of the fifteen (15) year period.

**3.** Paragraph 7.01 of the management agreement states that North Star shall be considered in default:

> (a) If Manager shall fail to keep, observe or perform any material covenant, agreement, term or provision of this Agreement to be kept, observed or performed by Manager, and such default shall continue for a period of sixty (60) days after notice thereof by Owner to Manager;
> (b) If Manager shall apply for or consent to the appointment of a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, file a voluntary petition in bankruptcy, or admit in writing its inability to pay its debts as they come due, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Manager in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Manager a bankrupt or insolvent or approving a petition seeking reorganization of Manager or appointing a receiver, trustee or liquidator of Manager or of all or a substantial part of its assets, and such order, judgment or decree shall continue unstayed and in effect for any period of sixty (60) consecutive days;
> (c) If Manager, during the term of this Agreement, fails to perform in accordance with the minimum performance standards recited in the Management Fee Rider attached hereto and made a part hereof;
> (d) Upon the death, disability, insanity, or retirement of James M. Grisebaum;
> (e) If James M. Grisebaum should hold less than Fifty–One Per Cent (51%) ownership of Manager (managing entity); or,
> (f) If Manager, by its actions, causes the Hilton License Agreement to be terminated, or if Manager repeatedly and materially violates the terms and provisions of the Hilton License Agreement[.]

**4.** On the same day that North Star filed its complaint in federal court, September 14, 1987, Mid–City instituted an action in Hennepin County District Court seeking preliminary injunctive relief removing North Star from the Hotel, and a determination of the parties' rights and obligations under the management agreement. Mid–City also asserted claims for breach of contract and negligence against North Star and its on-site manager James Ashpole. North Star served its answer to the state court action on October 7, 1987, and asserted a counterclaim for breach of the management agreement which tracks the allegations of its complaint in the instant action.

Star seeks damages for the alleged breach of contract and for injury North Star allegedly suffered to its business reputation and goodwill. North Star further seeks a judgment declaring that North Star fully performed its duties under the management agreement and is not in default and finding that Mid–City was not entitled to terminate the agreement. On October 14, 1987 Mid–City answered North Star's complaint and filed a counterclaim alleging breach of contract and negligence and seeking ejectment of North Star from the Hotel. On December 3, 1987, upon expiration of the ninety-day period referred to in the letter of September 3, 1987, the management agreement was terminated and Mid–City took over management of the Hotel from North Star.

On February 3, 1988, Mid–City brought before the Court a motion to dismiss or for summary judgment arguing that North Star's action was barred for failure to comply with the Minnesota real estate broker licensing statute. The motion was extensively briefed and argued before the Court. By order dated March 8, 1988, the Court denied Mid–City's motion. On May 25, 1988, Mid–City brought a motion requesting that the Court certify to the Minnesota Supreme Court the question of the applicability of the Minnesota real estate broker licensing statute to North Star's hotel management activities. By order dated May 27, 1988, Mid–City's motion to certify was denied.

North Star, in paragraph 1 of its complaint, alleges that jurisdiction over this action is proper pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $10,000 and is between citizens of different states. North Star alleges in paragraph 2 of the complaint that "Plaintiff North Star is a Texas corporation with general offices at Suite 200, 1111 North Loop West, Houston, Texas 77008." Complaint par. 2. North Star does not allege the location of its principal place of business. In paragraph 3 of its complaint, North Star alleges that "Defendant Mid–City is a Minnesota limited partnership whose general partner, Harry A. Johnson,

Jr., is a resident of the State of Minnesota." Complaint par. 3.

Defendant Mid–City now moves the Court for an order dismissing the present action for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(h)(3), arguing that no diversity of citizenship exists between North Star and Mid–City. As an initial matter, Mid–City argues that North Star's failure to allege its principal place of business renders North Star's complaint defective under Fed.R.Civ.P. 8(a), which requires that a pleading setting forth a claim for relief contain a short and plain statement of the grounds for jurisdiction. Yet the failure to allege a principal place of business is not at the heart of Mid–City's motion. Rather, the crux of Mid–City's argument is that North Star's principal place of business is in Minnesota thus causing North Star to be a citizen of Minnesota for purposes of diversity jurisdiction. Mid–City argues that because Mid–City is also a citizen of Minnesota, diversity is lacking and North Star's complaint must be dismissed as it is premised solely on grounds of diversity jurisdiction. Based on the foregoing argument, Mid–City contends that any attempt by North Star to cure its defective pleading by amending its complaint would be ineffective as the absence of jurisdiction requires the action be immediately dismissed.

North Star opposes Mid–City's motion to dismiss. North Star contends that its principal place of business is Texas. North Star thus argues that diversity exists and that jurisdiction is proper under 28 U.S.C. § 1332. Based on the foregoing, North Star seeks permission to amend its complaint to reflect the fact that its principal place of business is Texas.

## DISCUSSION

■ Title 28 U.S.C. § 1332 establishes the diversity jurisdiction of the federal courts. Section 1332 provides in part:

(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between—

(1) citizens of different States....

28 U.S.C. § 1332(a). For purposes of diversity jurisdiction, a corporation is deemed to be "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c). The citizenship of a limited partnership is determined by the citizenship of the partners and includes, at a minimum, the citizenship of the general partner. *See Elston Investment, Ltd. v. David Altman Leasing Corp.,* 731 F.2d 436 (7th Cir.1984).

In this case, the parties apparently agree that Mid–City is a citizen of Minnesota for diversity purposes, based on the residence of Mid–City's general partner Harry Johnson in Minnesota. The parties further agree that, based on its incorporation in Texas, North Star is a citizen of Texas. Mid–City argues, however, that North Star has its principal place of business in Minnesota and thus is a citizen of Minnesota for diversity purposes pursuant to 28 U.S.C. § 1332(c). Mid–City thus contends that no diversity exists between itself and North Star and that the Court lacks jurisdiction over North Star's claims. Conversely, North Star argues that its principal place of business is in Texas and that it is a citizen only of the State of Texas for purposes of diversity. Accordingly, North Star argues that the requisite diversity exists for an exercise of jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

 The Court should note at the outset that whether North Star's principal place of business for purposes of diversity jurisdiction is in Texas is a question of fact on which North Star as the party asserting jurisdiction bears the burden of proof. *See Williams Pipe Line Co. v. City of Mounds View,* 651 F.Supp. 544, 547 (D.Minn.1986); *Alexander v. Allister Construction Co.,* 424 F.Supp. 277, 278 (N.D.Ill.1976); *Fellers v. Atchison, Topeka & Santa Fe Railway Co.,* 330 F.Supp. 1334, 1336 (D.Kan.1971). The Court must determine citizenship as of the date the complaint was filed. *See Sadat v. Mertes,* 615 F.2d 1176, 1180 (7th Cir.1980); *Janzen v. Goos,* 302 F.2d 421 (8th Cir.1962). In determining citizenship, the Court may consider affidavits and sworn documents submitted by the parties. *See Alexander,* 424 F.Supp. at 278.

 In determining a corporation's principal place of business, courts have employed a variety of tests and analyses. Some courts have applied the "nerve center" test first articulated by the United States District Court for the Southern District of New York in *Scot Typewriter Co. v. Underwood Corp.,* 170 F.Supp. 862 (S.D. N.Y.1959). In *Scot,* the defendant corporation was a manufacturer of typewriters and business machines with manufacturing facilities in three states, branch offices for service and distribution in more than one hundred cities, and executive offices in New York. Defendant argued that its principal place of business was Connecticut where its major development and production facility was located. The court held, however, that New York was defendant's principal place of business. The court noted that basic policy decisions were made in New York where personnel, sales, credit, accounting and other departments were headquartered. The court found that direction and control of the whole range of corporate activities emanated from New York and that New York served as the corporate "nerve center." *Scot,* 170 F.Supp. at 865. Numerous courts have applied the reasoning of *Scot* to find that the locus of corporate decision-making authority and overall control constitutes a corporation's principal place of business for diversity purposes. *See, e.g., Buethe v. Britt Airlines, Inc.,* 787 F.2d 1194, 1196 (7th Cir.1986); *Lugo–Vina v. Pueblo International, Inc.,* 574 F.2d 41, 43–44 (1st Cir. 1978); *Atlanta Shipping Corp. v. Chemical Bank,* 631 F.Supp. 335 (S.D.N.Y.1986), *aff'd,* 818 F.2d 240 (2d Cir.1987).

 Another test employed by courts in determining a corporation's principal place of business is the "corporate activities" or "operating assets" test set forth in *Kelly v. United States Steel Corp.,* 284 F.2d 850 (3d Cir.1960). Under this test, greater weight is given to the center of a corporation's production or service activities in determining principal place of business. *See U.S. Fidelity & Guaranty Co. v. DiMassa,*

561 F.Supp. 348, 351 (E.D.Pa.1983), *aff'd*, 734 F.2d 3 (3d Cir.1984). In *Kelly*, the defendant corporation had its largest production plant and a plurality of its employees in one state, Pennsylvania. Further, key officers with responsibility for operations were stationed in Pennsylvania. Based on these factors the court in *Kelly* found that although final executive authority and policy-making officers were located in New York, Pennsylvania was the corporation's principal place of business. *Kelly*, 284 F.2d at 854.

Some courts have developed yet another test for determining a corporation's principal place of business—the "total activity" test. *See, e.g., Vareka Investments N.V. v. American Investment Properties, Inc.*, 724 F.2d 907 (11th Cir.), *cert. denied*, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). As recognized by the United States Court of Appeals for the Fifth Circuit in *J.A. Olson Co. v. City of Winona*, 818 F.2d 401, 411 (5th Cir.1987), the "total activity" test is a hybrid of the "nerve center" and "corporate activity" test which considers all the circumstances surrounding a corporation's business to discern its principal place of business. The "total activity" test provides a realistic, flexible and nonformalistic approach to determining a corporation's principal place of business through a balancing of all relevant factors. *J.A. Olson*, 818 F.2d at 412.

Although the United States Court of Appeals for the Eighth Circuit has yet to expressly consider the appropriate test for determining a corporation's principal place of business, cases from district courts within the Eighth Circuit (at least one of which received the implicit endorsement of the court of appeals) indicate that the issue of a corporation's principal place of business should be determined on the basis of each individual case and suggest that the most appropriate test is the "total activity" test. *Associated Petroleum Producers, Inc. v. Treco 3 Rivers Energy Corp.*, 692 F.Supp. 1070 (E.D.Mo.1988), *citing, Mahoney v. Northwestern Bell Telephone Co.*, 258 F.Supp. 500 (D.Neb.1966), *aff'd*, 377 F.2d

549 (8th Cir.1967). As stated in *Mahoney*, 258 F.Supp. at 502,

> [T]he split of authority [regarding the appropriate test to apply to determine the principal place of business] is largely linguistic. Even the cases which have taken the "operating assets" approach have not ignored the location of the executive offices and of management activity.... Conversely, those cases which recognize the "nerve center" test have not done so without considering the location of the company's operations. In fact, all of the cases which have come to the attention of this Court agree that the determination must be based on the facts of each individual case.

The cases from courts within the Eighth Circuit not only suggest that the "total activity" test be used in determining a corporation's principal place of business, but also provide guidance in applying that test. *Associated Petroleum Producers*, 692 F.Supp. 1070 (E.D.Mo.1988). For example, when no one state is clearly the center of corporate activity, or accounts for the majority of the corporation's income, the headquarters and location of the corporate policy-making functions assume greater importance. *See Mahoney*, 258 F.Supp. at 502 (corporation operating in five states with no state clearly the center of corporate activity had its principal place of business in Nebraska where headquarters and policy-making functions were located). However, when virtually all of the corporate business is conducted in one state, but the headquarters and corporate policy-making functions are located in another, the situs of the corporate business assumes greater importance. *See Hanna Mining Co. v. Minnesota Power & Light Co.*, 573 F.Supp. 1395 (D.Minn.1983), *aff'd*, 739 F.2d 1368 (8th Cir.1984) (corporation which was created solely to hold and operate an interest in a mining project in Minnesota had its principal place of business in Minnesota and not in the state where its executive and administrative offices are located).

North Star was incorporated in Texas on September 8, 1978, three days before the management agreement between North Star and Mid–City was executed. Affidavit

of Daniel J. Maertens (Sept. 14, 1988) at par. 4. North Star was incorporated for the sole purpose of operating the Hilton Hotel owned by Mid–City. Deposition of James M. Grisebaum at 7–8. North Star was incorporated with nominal capitalization.

At all relevant times North Star maintained its corporate offices in Suite 200, 1111 North Loop West in Houston, Texas. Although North Star was listed in the building directory, the sign outside Suite 200 read "Olympia Hotels Corporation." *See* Affidavit of Daniel J. Maertens (Sept. 29, 1988), Exh. E. Suite 200 serves as the office for twenty-one entities with which North Star's principals are affiliated. Maertens Aff. (Sept. 14, 1988) par. 5; Grisebaum Dep. at 15. North Star has no published telephone listing for its offices. *See* Maertens Aff. (Sept. 29, 1988) par. 5.

All of North Star's officers and directors reside in Texas. Further, North Star's principal legal advisors and public accountants are located in Houston. Affidavit of James M. Grisebaum par. 17–18. North Star maintains its corporate records in Houston. Policy decisions emanate from the Houston office.

North Star derived its sole source of income from its activities as manager and operator of the Hotel in Minnesota.[5] North Star employed an on-site manager to coordinate activities at the Hotel. North Star maintained five bank accounts with Minnesota banks for purposes of operating the Hotel, and all receivables and most expenses were handled through these accounts. Affidavit of Gerald D. Halseth par. 4. While various bookkeeping and accounting tasks relating to the Hotel were performed in Texas, the bulk of North Star's management duties were conducted by Hotel employees in Minnesota. These employees were technically employees of the Hotel (Mid–City) under the terms of the management agreement. However, these employees were hired and paid by North Star and they performed duties required of North Star by the management agreement.[6] Thus, for all intents and purposes, the employees were employed by North Star to do its bidding.

■ Applying the "total activity" test to the facts stated above, the Court finds that North Star's principal place of business is in Minnesota. Clearly, Houston serves as the "nerve center" for North Star's management activities. Policy decisions were made by North Star's officers in Houston where final executive authority resided. This factor, however, is less important in a situation such as the one present here where the corporation's business is not far flung and operating activities are not taking place in several states. *See Associated Petroleum Producers*, 692 F.Supp. 1070 (E.D.Mo.1988), *citing Mahoney*, 258 F.Supp. 500; *see also, J.A. Olson*, 818 F.2d at 409, 411. North Star was incorporated for the single purpose of operating the Hilton Hotel in Minnesota. Therefore, North Star's single operating activity takes place in Minnesota. North Star's operations, as performed by its on-site manager and Hotel employees, are centered in Minnesota. In such a case, where virtually all of the corporate business is conducted in one state, but the headquarters and corporate policy making functions are performed in another, the location of the corporate activity assumes greater importance. *See Hanna Mining*, 573 F.Supp. 1395; *see also Lurie Co. v. Loew's San Francisco Hotel Corp.*, 315 F.Supp. 405 (N.D.Cal.1970).

The Court's conclusion that Minnesota is the site of North Star's principal place of business draws substantial support from the policies surrounding diversity jurisdiction. In determining Minnesota to be North Star's principal place of business, the above analysis relies on North Star's

---

5. North Star's primary asset is its interest in the Hotel as provided by paragraph 8.02 of the management agreement. To secure that interest during the pendency of this litigation, North Star has filed a Notice of Lis Pendens. *See* Maertens Aff. (Sept. 29, 1988) Exh. C, D.

6. Indeed, the orientation manual given to all Hotel employees included a welcome letter signed by James Grisebaum as president of North Star. *See* Maertens Aff. (Sept. 29, 1988) Exh. K.

business operations in Minnesota. These business operations require significant contacts with the public, especially through North Star's relationship with the Hotel employees, and create a visible presence on the part of North Star in Minnesota.[7] As stated in *Messinger v. United Canso Oil & Gas Ltd.,* 80 F.R.D. 730, 735 (D.Conn.1978),

> [I]f the purpose of diversity jurisdiction is to avoid the effects of prejudice against outsiders, then the principal place of business of a corporation should be the place where it has its greatest contacts with the public.... In most instances, that place is likely to be the site where actual business operations of the corporation are carried on since "it is by *visible presence,* including the employment of local people, that a corporation will become popularly recognized as 'domestic' rather than 'foreign.'"

*Messinger,* 80 F.R.D. at 735, *quoting Northeast Nuclear Energy Co. v. General Electric Co.,* 435 F.Supp. 344, 346 (D.Conn. 1977). Clearly, North Star is most visible in Minnesota. Accordingly, the purposes of diversity jurisdiction are not ill-served by a finding that North Star's principal place of business is in Minnesota and a corresponding dismissal of this action for lack of proper diversity.

As the Court has noted in a previous case, section 1332(c) was clearly designed to reduce the number of cases coming to federal courts on the ground of diversity of citizenship. *See LeNeave v. North American Life Assurance Co.,* 632 F.Supp. 1453, 1454 n. 1 (D.Minn.1986); *see also* S.Rep. No. 1830, 85th Cong., 2d Sess. (1958), U.S. Code Cong. & Admin.News 1958, at 3099–3100. That goal is furthered by the above analysis. By finding Minnesota to be North Star's principal place of business, the Court will be required to dismiss this action for lack of subject matter jurisdiction. Such a result is consistent with the limited nature of federal[8] jurisdiction which traditionally has been narrowly construed. *See Williams Pipe Line Co. v. City of Mounds View,* 651 F.Supp. 544 (D.Minn.1986); *see also Healy v. Ratta,* 292 U.S. 263, 270, 54 S.Ct. 700, 703, 78 L.Ed. 1248 (1934).

The Court finds that North Star's principal place of business for diversity purposes is Minnesota and that North Star is a citizen of Minnesota pursuant to 28 U.S.C. § 1332(c). Based on North Star's Minnesota citizenship and the resulting lack of diversity between North Star and Mid–City, the Court will grant Mid–City's motion to dismiss for lack of subject matter jurisdiction. Further, because North Star cannot cure the Court's lack of subject matter jurisdiction by amending its complaint, the Court will deny North Star's motion to amend.

Based on the foregoing, and on all the files, records, proceedings and arguments of counsel,

IT IS ORDERED that

(1) defendant's motion to dismiss plaintiff's complaint for lack of subject matter jurisdiction is granted; and

(2) plaintiff's motion to amend its complaint is denied.

LET JUDGMENT BE ENTERED ACCORDINGLY.

---

**7.** This public presence in Minnesota is in stark contrast to North Star's low profile in Texas where it has little public contact (*e.g.,* no phone listing nor independent, clearly identified office).

**8.** The Court's decision to dismiss the instant case is not unfair to North Star, as all discovery conducted in this case will be available to the parties in the pending state court action as represented by counsel for Mid–City at oral argument. North Star will have the opportunity to fully litigate its claims in state court.